1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

| | |
|---|---|
| CHAU VAN, | Case No.  13-cv-00992-JCS |
|        Plaintiff, | **ORDER DENYING MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
|     v. | |
| CITY OF OAKLAND, et al., | |
|        Defendants. | |
| | Re: Dkt. Nos. 46, 56 |

## I.    INTRODUCTION

Plaintiff Chau Van brings this civil rights action against Defendants City of Oakland and Officers Howard Jordan, Johnna Watson and Cynthia Perkins.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Presently before the Court are two motions: 1) Plaintiff's Motion for Leave to File First Amended Complaint ("Motion for Leave to Amend"); and 2) Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Summary Judgment Motion").  A hearing on the Motions was held on Friday, February 27, 2015 at 2:00 pm.  For the reasons stated below, the Motion for Leave to Amend is DENIED.  The Summary Judgment Motion is GRANTED.

## II.  [1.]  BACKGROUND

### A.    Factual Background[1]

#### Events of December 9, 2011

On December 9, 2011, an employee of Kaiser Oakland called the Oakland Police Department and reported that a man named Quyen Nguyen had come into the emergency

---

[1] Unless otherwise stated, the facts below are undisputed.

United States District Court
Northern District of California

room with "multiple abrasions to his face, a bloody lip and possibly some chipped teeth" and that he was "quite dazed."  Declaration of Ametrius Sidney in Support of Motion for Summary Judgment ("Sidney Decl."), Exhibit A.  According to the employee, the man said that he had been assaulted outside the Fortune Restaurant on Webster Street in Oakland by a friend of his sister's ex-boyfriend.  *Id*.  The 911 operator told the employee that she believed that an officer had already been sent out to investigate the incident earlier in the evening but that an officer would be dispatched to Kaiser if more information was needed.  *Id*.  Oakland police officer Astra Goddard was dispatched to Kaiser Hospital, where she "made contact" with Mr. Nguyen and photographed his injuries.  Declaration of Astra Goddard in Support of Motion for Summary Judgment ("Goddard Decl."), ¶¶ 3-5 & Exhibit A (photographs).[2]

In the meantime, Oakland Police Officers Roger Lee and John O'Reilly had been dispatched the same evening to Summit Hospital to speak with another man who had come to the emergency room there reporting an assault, Richard Lei.  Declaration of DeWitt Lacy in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Lacy Decl."), Ex. A (Lei Dep.) at 24;  *id*., Ex. B (Jimenez Dep.), Ex. 3 (Incident Report).  The Incident Report, completed by Officer Lee, states, in part, as follows:

> On December 9, 2011, at around 0500 hours, Officer J. O'Reilly and I responded to Summit Hospital to locate an assault victim.  Upon arrival in the ER Officer O'Reilly and I located victim Lei Wen who stated that someone hit him in the head with a bat.  V1 Lei had bandages on his head and cuts and bruises to his face.  V1 Lei had a two inch cut above his right eye and a swollen right cheek.  V1 Lei stated that around 0230 hours, December 9, 2011, he went to a restaurant on the corner of 10th and Webster St.  V1 said that an unidentified male Asian hit him two times with a wooden baseball bat above his right eye and cheek area.  V1 said that after he was hit he ran two blocks away and called his sister to pick him up.  V1 stated that his sister drove him to Summit Hospital and medical staff called the police.  V1 stated that he cannot identify who hit him and can provide no further information about the incident.

Lacy Decl., Ex. B (Jimenez Dep.), Ex. 3.   According to the Incident Report, Officer Goddard also photographed Mr. Lei's injuries.  *Id*.

---

[2] There is no incident report in the record with respect to this call.

United States District Court
Northern District of California

**Police Interviews of Tiffany, Andrew and Quyen Nguyen**

On December 13, 2011, Officer Phong Tran, who was working in the Criminal Investigation Division of the Oakland Police Department, received a telephone call from a woman who identified herself as Tiffany Huong Nguyen.  Declaration of Phong T. Tran in Support of Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Tran Decl.") ¶ 2.  According to Officer Tran, Ms. Nguyen told him that her brother, Quyen Nguyen, had been "beat up in front of the Fortune Restaurant in Oakland a few nights earlier, that she could identify the person who beat up her brother, and that her brother wanted to file a report against the person who beat him up." Tran Decl. ¶ 3.  He further states that "Ms. Nguyen explained . . . that she did not witness the assault on her brother but her brother Andrew Nguyen witnessed the assault and both Andrew and Quyen (the victim) told her that it was her ex-boyfriend's friend 'Chau' who assaulted Quyen." Tran Decl. ¶ 4.  Officer Tran states that Ms. Nguyen told him she knew "Chau" and could provide the police department with information about him.  Tran Decl. ¶ 4.  According to Officer Tran, he told Ms. Nguyen that she and her brothers needed to come down to the police station so they could be interviewed about the assault on Quyen and Ms. Nguyen agreed to do so. Tran Decl. ¶ 5.

After Officer Tran got off the phone with Ms. Nguyen, he told Officer Hector Jimenez about the call, provided Officer Jimenez with Ms. Nguyen's contact information, and asked Officer Jimenez to take the lead in the investigation and follow-up with Ms. Nguyen. Tran Decl. ¶ 6.  Officer Jimenez called Ms. Nguyen shortly thereafter.  Declaration of Hector Jimenez in Support of Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Jimenez Decl.") ¶ 4.  Officer Jimenez states in his declaration that during his telephone conversation with Ms. Nguyen, she told him that the name of the person who assaulted her brother is "Chau Van" and that he had a dragon tattoo on his back.  Jimenez Decl. ¶ 5.  According to Officer Jimenez, Ms. Nguyen explained that she knows Chau Van because Mr. Van is a good friend of her ex- boyfriend.  Jimenez Decl. ¶ 6.

Officer Jimenez states in his declaration that with the information provided by Ms. Nguyen, he was able to locate a Chau Ngoc Van in the Alameda County Consolidated Records

1  Information Management System (CRIMS).  Jimenez Decl.  ¶ 7.  He states that "[a]rrangements

2  had been made for Ms. Nguyen to come to the police station with her brothers Quyen Nguyen and

3  Andrew Tien Nguyen in the afternoon on December 13, 2011 so they could be interviewed about

4  the assault on Quyen."  Jimenez Decl. ¶ 8.  According to Officer Jimenez, prior to their arrival at

5  the police station, he compiled two separate photo arrays that included a photograph of the Chau

6  Ngoc Van he located in the CRIMS database and five additional photographs of male Asians with

7  features similar to Mr. Van.  Jimenez Decl. ¶ 9.  At approximately 4:00 p.m. on December 13,

8  2011, Ms. Nguyen arrived at the police station with her brothers Quyen Nguyen and Andrew Tien

9  Nguyen.  Jimenez Decl. at ¶ 10.

10       Officers Tran and Jimenez interviewed Ms. Nguyen first, outside the presence of her

11  brothers.  Jimenez Decl. ¶ 11 & Exhibit A (Video Recording of Tiffany Nguyen Interview, Time

12  Counter 4:36:05 - 4:59:20).   During the interview, Ms. Nguyen suggested to  the officers that a

13  custody battle between her and her ex-boyfriend, Samson Lam, might be linked to the assault on

14  her brother Quyen.  Jimenez Decl. ¶ 12 & Exhibit A (Video Recording of Tiffany Nguyen

15  Interview, Time Counter 4:36:05 - 4:59:20); *id.*, Ex. E (transcript of Video Recording) at 15.  In

16  particular, Ms. Nguyen explained that when she confronted Mr. Lam about her brother being

17  assaulted by Chau Van, he denied knowing anything about the assault but admitted to telling his

18  friend about their custody battle.  *Id*.  Ms. Nguyen stated that her brother Quyen thought that the

19  incident was linked to the custody battle.  *Id*.  During the interview, Ms. Nguyen also told the

20  officers that she had seen her ex-boyfriend's friend, Chau Van, many times in the past.  *Id*.

21  Officer Jimenez showed Ms. Nguyen an unmarked photograph of the Chau Ngoc Van he had

22  located in the CRIMS database and she immediately confirmed that the Chau Ngoc Van in the

23  photograph was the same Chau Van she had been referring to and she knew as a friend of her ex-

24  boyfriend, Samson.  Jimenez Decl. ¶ 13 & Exhibit A (Video Recording of Tiffany Nguyen

25  Interview, Time Counter 4:46:54 - 4:47:06; 4:53:10 - 4:53:18).

26       Next, Officers Tran and Jimenez interviewed Andrew Tien Nguyen outside of the presence

27  of his sister.  Jimenez Decl., ¶ 14.  During the interview, Andrew told the officers that on the night

28  of the assault, he and his brother Quyen went out for a late dinner at the Fortune Restaurant in

United States District Court
Northern District of California

1   Oakland. Jimenez Decl. ¶ 15 & Exhibit A, (Video Recording of Andrew Tien Nguyen, Time

2   Counter 5:03:12- 5:07:43).   According to Andrew, he and his brother did not immediately enter

3   the restaurant but instead stood out front while Quyen smoked a cigarette.  *Id.*  Andrew stated that

4   while Quyen was smoking his cigarette, Andrew saw "Chau" approach with a couple of other

5   guys. *Id.*  Andrew walked over to "Chau" to say "hey" because Andrew had not seen "Chau" in 4

6   or 5 years.  *Id.*  Andrew said that "Chau" greeted him back and then pointed at Quyen and said

7   "hey isn't that Tiffany's brother Quyen."  *Id.*  According to Andrew, he said "yes" and then

8   "Chau" and his friends walked towards Quyen. *Id.*   Andrew said that everything seemed "cool" so

9   he went inside the Fortune Restaurant to get a table.  *Id.*  The next thing Andrew recalled was

10  seeing his brother on the ground being hit with a bat, punched and kicked.  *Id.*  Andrew stated that

11  the man hitting Quyen with a bat was not "Chau" but rather one of the men who was with "Chau."

12  *Id.* According to Andrew, "Chau" was just kicking.  *Id.*  Andrew said he ran to help his brother

13  and "Chau" and the other guys jumped in a silver Mercedes and took off.  *Id.*  Officer Jimenez

14  showed Andrew the six person photo array he compiled containing the photograph of Chau Ngoc

15  Van from the CRIMS database in the number 2 position.  Jimenez Decl. ¶ 16.  Andrew

16  immediately identified Chau Ngoc Van from the photo array as the "Chau" he saw assaulting his

17  brother in front of the Fortune Restaurant.  Jimenez Decl. at ¶ 13 & Exhibit A (Video Recording

18  of Andrew Tien Nguyen, Time Counter 5:13:51- 5:14:15).  Andrew told Officers Jimenez and

19  Tran that his brother Quyen had "two broken jaws" from the assault and that the previous day

20  Queyen had had an operation and so his jaw was wired shut.  Lacy Decl., Ex. E (Video Recording

21  transcript) at 61.

22          Officers Tran and Jimenez met with Quyen Nguyen last, outside the presence of his

23  brother and sister.  Jimenez Decl. ¶ 18 & Exhibit A (Video Recording of Quyen Nguyen

24  Interview, Time Counter 5:27:10- 5:42).   Quyen had difficulty speaking and so Officers Tran and

25  Jimenez did not conduct a full interview.  Jimenez  Decl. ¶19 & Exhibit A (Video Recording of

26  Quyen Nguyen Interview, Time Counter 20 5:27:10- 5:42).  Office Jimenez showed Quyen the six

27  person photo array he compiled containing the photograph of Chau Ngoc Van from the CRIMS

28  database in the number 4 position.  Jimenez Decl. ¶ 20 & Exhibit A (Video Recording of Quyen

Nguyen Interview, Time Counter 24 5:34:25 - 5:35:24).  Quyen reviewed the photo array for

approximately 10 to 15 seconds and then identified Chau Ngoc Van from the photo array as the

"Chau" who assaulted him in front of the Fortune Restaurant.  Jimenez Decl. ¶ 26 & Exhibit A

(Video Recording of Quyen Nguyen Interview, Time Counter 5:34:2 - 5:35:24).  When asked if

"Chau" had hit him with a baseball bat, Quyen said he was "not sure if it was a bat or a pipe."  *Id.*

### Chau Van's Account of the Events of December 9, 2011

An entirely different description of the events that occurred outside the Fortune Restaurant

on December 9, 2011 was provided by Plaintiff Chau Van.  According to Chau Van, on December

9, 2011, he and his friend, Richard Lei, decided to go to Fortune Restaurant in Oakland,

California, where they planned to meet a friend.  Declaration Of Chau Van In Support Of

Plaintiff's Opposition To Defendants' Motion For Summary Judgment Or, In The Alternative,

Partial Summary Judgment ("Van Decl.") ¶ 2.  He describes what occurred there as follows:

> As Richard and I approached the restaurant I saw Andrew Nguyen
> and we greeted each other. I have known Andrew and his family,
> including his sister, Tiffany Nguyen and brother, Quyen Nguyen, for
> many years. Andrew Nguyen was accompanied by his brother,
> Quyen Nguyen and about seven (7) to eight (8) other men.  Quyen
> Nguyen appeared drunk, he was slurring his words and appeared
> unable to stand straight. . . . As Andrew and I conversed, Quyen
> began speaking roughly to Richard and suddenly a fight broke out
> with Richard and the group of men with Quyen and Andrew. I
> attempted to break up the fight and help Richard. Someone in the
> group hit Richard in the head with by a baseball bat. While I was
> trying to help Richard I was attacked and had to defend myself. I
> was also hit in the head with a baseball bat. At the time the fight was
> going on I was in fear of my life. . . .  As Richard and I were being
> attacked, others came to the scene helped us to get away from the
> group of men beating us. As Richard and I ran get away we saw the
> friend we called to have dinner with us. We immediately got into
> our friend's car and left the scene.

*Id.*, ¶¶ 4-5. Chau Van states that Richard went to Summit Hospital to be treated for his injuries.

*Id.* ¶ 5.  He states further Richard told him the next day that he had been interviewed by police

officers while he was at the hospital. Id. ¶ 7.  According to Chau Van, he suffered "several

injuries including a large bump, the size of an egg" on his forehead, but he did not seek medical

treatment.  *Id.*  ¶ 6.  Chau Van also states that he was never contacted by the police about the

December 9, 2011 assault.  *Id.*, ¶ 7.

United States District Court
Northern District of California

6

United States District Court
Northern District of California

**Issuance of Arrest Warrant**

On December 19, 2011, Officer Jimenez prepared an affidavit in support of a warrant for the arrest of Chau Ngoc Van for assault with a deadly weapon based.  Jimenez Decl., Ex. B.  The affidavit described the interviews with Tiffany Nguyen, Andrew Nguyen and Quyen Nguyen, stating that Tiffany and Quyen Nguyen "instantly" recognized Chau Van from the photo line-up presented to them, and that Andrew Nguyen "immediately" recognized Chau Van.  *Id*.  The affidavit does not mention Richard Wei or the incident report prepared the same night by Officers Lee and O'Reilly.  Magistrate Judge Sarkisian issued a warrant for the arrest of Chau Ngoc Van for assault with a deadly weapon on that same date.  Jimenez Decl. ¶ 24, Exhibit B.

**February 7, 2012 Press Release**

**5.** On February 7, 2012, Officer Johnna Watson, the Public Information Officer for the Oakland Police Department, attended a meeting with several members of the Oakland Police Department, including Chief Howard Jordan, to prepare for an upcoming press conference.  Lacy Decl., Ex. C (Watson Dep.) at 34-40.  At the meeting, Officer Watson received a document from Chief Jordon regarding Oakland's five most wanted criminals, which included a photograph and description of Chau Van, who was wanted in connection with a shooting.  *Id*. at 40.  According to Officer Watson, the document she received from Chief Jordon was prepared by the Oakland Police Department's Criminal Investigation Division.  *Id*. at 43.  In February of 2012, Captain Anthony Rachal headed the Criminal Investigation Division.  *Id*. at 34.  Officer Watson relied on the information provided to her to prepare the press release for the upcoming press conference.  *Id*. at 44.  She worked with Defendant Cynthia Perkins, the public safety writer employed by the Oakland Police Department, to prepare and issue the press release.  *Id*. at 59-60.

On February 7, 2012, a press conference was held by former Chief of Police, Howard Jordan, about a spike in crime in Oakland.  Watson Decl. ¶ 2.  During the press conference, Chau Van was identified as one of Oakland's "Most Wanted." Watson Decl. ¶ 3.   On the same day, the press release prepared by Watson and Perkins, discussed above, was issued.  *Id*. ¶ 4.  It was entitled  "Oakland Police Chief Speaks to the Spike in Crime"  and identified Chau Van as one of Oakland's "Most Wanted."  *Id*. & Ex. A.

**Chau Van's Self-Surrender and Arrest**

According to Chau Van, after the press conference, he received a telephone call from a friend telling him he had been named one of Oakland's "Most Wanted." Van Decl. ¶ 8.   He states that he was "confused and very scared" and that he did not go to work for a week or leave his friend's house.   *Id*. ¶ 9.   He then sought the advice of a criminal defense attorney, Stuart Hanlon. *Id*.;  Declaration of Stuart Hanlon in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Hanlon Decl.") ¶ 3.   At some point, Mr. Hanlon spoke with someone at the Oakland Police Department to try to determine "why Mr. Van had a warrant for a shooting, and why he was classified as one of Oakland's most wanted criminals."  Hanlon Decl. ¶ 4.

On February 13, 2012, Chau Van turned himself into the Oakland Police Department, accompanied by his attorney.  Van Decl. ¶ 10.  He offers the following account of what occurred at the police station:

> About a week later and accompanied by my attorney, I turned myself in at the Oakland Police Department. Initially, when I checked in at the front desk and asked if there was a warrant for my arrest, the person at the front desk said "no," but then told me to wait. The person at the front desk returned with a Latino officer. That Latino officer placed me in handcuff and took me into a room to be interrogated.  At this time, the officer would not allow my attorney to accompany me into the room where I was questioned. . . . During the initial questioning with the Latino officer I asked was I being arrested for being one of Oakland Most Wanted Criminal. The officer said "no" this was about another incident. The Latino officer asked me if I was a gang member. I said "no." Then the Latino officer asked me did I know Wen Chuang Lei. At the time, I did not know Wen Chuang Lei was Richard Lei's, Chinese name, so I said "no." The Latino officer asked me was I sure, and I stated that I did not know a Wen Chuang Lei and that I wanted my attorney. The Latino officer arrested me but never told me the charges against me.

*Id*. at ¶¶ 10-11.   Neither Johnna Watson nor Cynthia Perkins was present at the time Mr. Van was arrested.  Watson Decl. ¶ 6;  Declaration of Cynthia Perkins in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Perkins Decl.") ¶ 4. Neither participated in the arrest of Chau Van or had any knowledge that Mr. Van had been arrested until after the arrest occurred.  *Id*.

After being arrested and booked, Chau Van was sent to Santa Rita Jail and placed in

United States District Court
Northern District of California

maximum security.  Van Decl. ¶12.  He remained there for approximately thirty-six (36) to forty-eight (48) hours. *Id*.   According to Mr. Van, he was never told what charges were filed against him.  *Id*.   He was released from Santa Rita Jail after the district attorney dropped the charges against him.  *Id*.

**Training of Officer Jimenez**

Plaintiff presents the following evidence regarding the background and training of Officer Jimene,z.:

- In or around 2007, Officer Hector Jimenez was hired as a police cadet by the Oakland Police Department after his completion at a Police Officer Standards and Training ("POST") certified police academy.  Lacy Decl., Ex. B (Jimenez Dep.) at 13-14.

- At the police academy, Jimenez received training in "preliminary investigations."   This training involved learning how to divide people, listen to them and attempt to identify who was a suspect, who was a victim and who was a witness and determine what happened. *Id*. at 25.

- In December of 2011, shortly before Officer Jimenez became a misdemeanor assault investigator, he received approximately 40 hours of training in how to draft search warrants.  *Id*. at 22.

- Officer Jimenez had received no specialized training relating to assault investigations as of the time of the relevant events in this case. *Id*. at 21.

**B.    Complaint**

Chau Van filed the complaint in this action on March 5, 2013, naming as defendants the City of Oakland, Police Chief Howard Jordan, Officer Watson and Officer Perkins, as well as Does 1-100. Plaintiff asserts six claims in his complaint: 1) violation of 42 U.S.C. § 1983 claim for violation of his First and Fourth  Amendment rights under United States Constitution, asserted against Defendants Johnna Watson and Cynthia Perkins; 2) violation of 42 U.S.C. § 1983 under *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 659 (1978), asserted against the City and Chief Jordan, based on alleged ratification of misconduct or failure to train leading to violation of Plaintiff's civil rights; 3) defamation under state law, asserted against Doe defendants

only; 4) false arrest and imprisonment, asserted against Officers Watson and Perkins; 5) Intentional Infliction of Emotional Distress, asserted against Officers Watson and Perkins, as well as Doe defendants;  and 6) Negligence, asserted against Officers Watson and Perkins, as well as Doe Defendants.

### C.    Summary Judgment Motion

#### The Motion

In their Motion, Defendants ask the Court to enter summary judgment on all of Plaintiff's claims except his Third Cause of Action (which is asserted against Doe defendants only).

First, Defendants contend Plaintiff's First Cause of Action, under 42 U.S.C. § 1983, asserted against Defendants Watson and Perkins, fails as a matter of law to the extent it is based on alleged violation of the Fourth Amendment because: 1) there is no evidence that either defendant was involved in any way in Plaintiff's arrest; 2) Plaintiff's arrest did not violate his Fourth Amendment rights because it was conducted pursuant to a facially valid warrant and Officer Jimenez had probable cause to arrest in any event; and 3) a search pursuant to a valid arrest does not violate an individual's Fourth Amendment rights.  Summary Judgment Motion at 7-11.

Second, Defendants argue that Plaintiff's First Cause of Action fails  as a matter of law to the extent it is based on alleged violation of the First Amendment because Plaintiff has not presented any evidence that he engaged in constitutionally  protected speech for which he was subjected to adverse action.  *Id*. at 11-12.

Third, Defendants challenge Plaintiff's Second Cause of Action, asserting violation of 42 U.S.C. § 1983 by the City of Oakland under *Monell* on the basis that 1) Plaintiff has failed to present evidence that he has been deprived of any constitutional right; and 2) he has failed to offer any evidence that the City was the "moving force" behind any alleged constitutional violation.  *Id*. at 12-13.

Fourth, Defendants argue that Plaintiff's Fourth Cause of Action, asserting False Arrest and False Imprisonment against Defendants Watson and Perkins, fails as a matter of law because there is no evidence that either defendant played any role in Plaintiff's arrest.  *Id*. at 13.

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1    Fifth, Defendants challenge Plaintiff's Fourth Cause of Action (False Arrest/ False

2  Imprisonment), Fifth Cause of Action (Intentional Infliction of Emotional Distress) and Sixth

3  Cause of Action (Negligence) on the grounds that, to the extent these claims are based on

4  Plaintiff's arrest, they are barred under Cal. Civ. Code section 43.55(a), providing that "no cause

5  of action shall arise against [ ] any peace officer who makes an arrest pursuant to a warrant of

6  arrest regular upon its face if the peace officer in making the arrest acts without malice and in

7  reasonable belief that the person arrested is the one referred to in the warrant." *Id*. at 13-14.

8  Defendants contend these three causes of action are barred under section 43.55(a) because Officer

9  Jimenez had a good faith belief, based on his interviews with the Nguyen siblings, that Chau Van

10  was involved in an assault on Quyen Nguyen and it is "indisputable" that Officer Jimenez

11  reasonably believed Plaintiff was the person referred to in the warrant. *Id*. at 14.

12    Sixth, Defendants argue that Plaintiff's Fifth and Sixth Causes of Action are barred, to the

13  extent the claims are based on public communications identifying Plaintiff as Oakland's "Most

14  Wanted," under the First Amendment of the United States Constitution, Cal. Civ. Code section

15  47(d)(1) and Cal. Gov't Code section 821.6. *Id*. at 14-17. In particular, under the First

16  Amendment, Defendants contend, speech on matters of public concern is protected and therefore

17  may not be the basis for claims of intentional infliction of emotional distress or negligence. *Id*. at

18  14-15. Further, Cal. Civ. Code section 47(d)(1) renders privileged any "fair and true report" of a

19  "public official proceeding," which Defendants contend includes police investigations. *Id*. at 15-

20  16. Defendants argue that the "fair and true" requirement of section 47(d)(1) is met so long as the

21  statement captures the "gist" of what was said in the public proceeding and that here, this

22  requirement was met because Chau Van was wanted for assault with a deadly weapon even if he

23  was not wanted for a shooting. *Id*. at 16. Finally, Cal. Gov't Code section 821.6 gives public

24  employees immunity from liability for an injury caused by the employee's "instituting or

25  prosecuting any judicial or administrative proceeding . . . even if he acts maliciously and without

26  probable cause." *Id*. at 16. Defendants argue that this immunity is broadly construed and includes

27  an investigation before the institution of a judicial proceeding. *Id*. According to Defendants, the

28  statement that Chau Van was one of Oakland's "Most Wanted", both at the press conference and

in the press release, was "incidental to the police investigation of the assault on Quyen Nguyen" and therefore cannot give rise to liability. *Id*. at 16-17.

### Opposition

Plaintiff argues that the Court should defer ruling on the Summary Judgment Motion under Rule 56(d) of the Federal Rules of Civil Procedure to allow further discovery because Defendants have hampered Plaintiff's discovery efforts and Plaintiff only recently learned of material and probative evidence related to his claims. Opposition at 13. Even if the Court denies this request, he contends, Defendants' Summary Judgment Motion should be denied as to all of Plaintiff's claims. *Id*.

With respect to the First Cause of Action, Plaintiff rejects Defendants' assertion that to the extent this § 1983 claim is based on an alleged violation of the Fourth Amendment it fails as a matter of law. *Id*. at 14-19. First, Plaintiff challenges Defendant's contention that there is no evidence of a Fourth Amendment violation, arguing that Officer Jimenez violated Plaintiff's constitutional rights when he obtained a warrant for Chau Van's arrest that lacked probable cause. *Id*. at 14-17. In support of this assertion, Plaintiff cites evidence that Officer Jimenez failed to talk to Officers Lee and O'Reilly about the December 9, 2011 incident, failed to investigate inconsistencies in the stories of the Nguyen siblings (including the conflict between Quyen's apparent testimony that Chau Van hit him with a bat or pipe and Andrew's testimony that a different man hit Quyen with a bat and that Chau Van did not have a bat and only kicked Quyen), and incorrectly stated in the warrant affidavit that Quyen Nguyen "instantly" identified Chau Van in the photo line-up. *Id*. Under the totality of the circumstances test that is applied to probable cause determinations, Plaintiff contends, this evidence is sufficient to demonstrate a fact question as to whether his Fourth Amendment rights were violated. Second, Plaintiff rejects Defendants' assertion that Defendants Watson and Perkins cannot be liable for a Fourth Violation because they were not involved in Plaintiff's arrest. *Id*. at 18-19. According to Defendants, in issuing a press release that ultimately caused Chau Van to self-surrender, Defendants Watson and Perkins "integrally participated" in the Fourth Amendment violation and that is all that is required under § 1983. *Id*.

United States District Court
Northern District of California

United States District Court
Northern District of California

As to Plaintiff's § 1983 claim based on Defendants' alleged violation of his First Amendment rights, Plaintiff argues that he should be permitted to conduct additional discovery in light of new information and witnesses of which he became aware only when Defendant Watson was deposed, on November 19, 2014.  *Id*. at 19.

Similarly, with respect to Plaintiff's Second Cause of Action, asserted against the City of Oakland based on an alleged policy and practice of failing to train and supervise employees, Plaintiff asserts he has not yet been able to depose Chief Howard Jordan and that he just recently learned the identities of supervisors and heads of divisions in the Oakland Police Department  who could provide "significant and relevant evidence of the Department's and the City's policies, practices and customs." *Id*. at 20.  Plaintiff further asserts that Officer Jimenez's lack of training for the position of criminal investigator, as well the lack of adequate supervision, are sufficient to show a policy and custom of deliberate indifference to constitutional violations.  *Id*. at 21.

Plaintiff argues that his Fourth Cause of Action, for False Imprisonment and False Arrest, is sufficient to survive summary judgment because although Defendants Watson and Perkins did not actually arrest him, they played a role in issuing a press release that ultimately led to Chau Van's self-surrender, culminating in his arrest.  *Id*. at 21-22.

Plaintiff rejects Defendants' assertion that Cal. Civ. Code section 43.55(a)[3]  bars his Fifth and Sixth Causes of Action, arguing that this section does not apply because the warrant is not supported by probable cause and therefore Officer Jimenez could not have reasonably and in good faith relied upon it.  *Id*. at 22.

Plaintiff also asserts that the Defendants' reliance on the First Amendment with respect to the Fifth and Sixth Causes of Action is misplaced because the statement at the press conference and in the press release that Chau Van was one of Oakland's "Most Wanted" was not a matter of public concern or debate.  *Id*. at 22-23. Plaintiff notes that the case cited by Defendants, *Snyder v. Phelps*, 131 S. Ct. 1207 (2011), involved two non-governmental parties and argues that therefore, it is not on point.  *Id*. at 23.  Plaintiff also asserts that as to this claim, discovery is ongoing and

---

[3] Although Plaintiff refers to this section as 4.55(a) rather than 43.55(a), it is clear from context that this is a typographical error.

"many of the issues raised are premature." *Id.*

Plaintiff argues that Cal. Civ. Code section 47(d)(1), which affords a privilege to "fair and true" statements about public proceedings, does not defeat his Fifth and Sixth Causes of Action because the statement that he was one of Oakland's "Most Wanted" was not "fair and true" and did not cover the "gist" of the proceeding. *Id.* at 24. Plaintiff contends there is a fact question as to the source of information contained in the press release and even as to whether the statement was based on the affidavit of Officer Jimenez. *Id.*

Finally, Plaintiff argues that Cal. Gov't Code section 821.6 does not provide a defense to his Fifth and Sixth Causes of Action because the statements made at the press conference and the press release were not part of the filing of a judicial administrative proceeding or an investigation leading up to such a proceeding. *Id.* at 24-25.

**3.**        **Reply**

Defendants reject Plaintiff's assertion that they have hindered Plaintiff's discovery efforts and argue that the Court should not defer ruling on their Summary Judgment Motion to permit further discovery. Reply at 1. They argue further that Plaintiff has failed to comply with Rule 56(d) of the Federal Rules of Civil Procedure, requiring that a party invoking that provision set forth the specific facts it expects to learn that justify the relief requested. *Id.* They also contend Plaintiff failed to pursue discovery diligently prior to summary judgment. *Id.* at 2.

Defendants also challenge Plaintiff's arguments on the merits. First, they reiterate their assertion that the First Cause of Action fails to the extent it is based on an alleged Fourth Amendment violation. *Id.* at 3-6. Plaintiff's arguments to the contrary fail, they contend, because Defendants Watson and Perkins had no "fundamental involvement in the conduct that allegedly caused the violation" and therefore were not "integral participants" in Plaintiff's arrest. *Id.* at 3-4. Defendants also challenge Plaintiff's reliance on the alleged violation of his Fourth Amendment rights by Officer Jimenez, pointing out that Officer Jimenez is not a defendant in this case. *Id.* at 5.

Defendants argue that Plaintiff has failed to offer any substantive response to their contention that the § 1983 claim based on alleged violation of the First Amendment should fail for lack of evidence that Plaintiff engaged in any protected speech. *Id.* at 6. Nor should the Court

United States District Court
Northern District of California

accept Plaintiff's assertion that more discovery is needed on this claim, they argue, given that the critical issue is whether *Plaintiff* engaged in protected speech. *Id.*

With respect to the *Monell* claim against the City of Oakland, Defendants argue that a city policy based on failure to train can be established only when the failure to train reflects a "deliberate" or "conscious choice." *Id.* at 7. According to Defendants, evidence as to a single officer, which is all that Plaintiff has offered here, is not sufficient to establish a municipal policy. *Id.*

Defendants again argue that Cal. Civ. Code section 43.55(a) bars Plaintiff's Fifth and Sixth Causes of Action, noting that Plaintiff does not dispute that the arrest warrant was facially valid. *Id.* at 7-8. To the extent Plaintiff argues that Officer Jimenez could not have relied on the warrant in good faith, Defendants argue that this evidence is not sufficient to show "malice" as would be required to defeat the immunity provided for under this section. *Id.* at 7-8. "Malice," Defendants assert, exists only when an officer knowingly uses false information or purposely withholds exculpatory evidence. *Id.* There is no evidence that Officer Jimenez engaged in such intentional conduct, Defendants assert. *Id.* Even if he did, they argue, Defendants Watson and Perkins would still be entitled to immunity under this provision because there is no evidence that they were aware of any such conduct. *Id.*

Defendants reiterate their assertion that the First Amendment bars Plaintiff's Fifth and Sixth Causes of Action, rejecting Plaintiff's argument that the statements at issue are not matters of public concern. Defendants also point to a California case in which a court found that a defamation claim was barred under the First Amendment even as to "non-media defendants including public entities such as the City." *Id.* at 9 (citing *Nizam-Aldine v. City of Oakland*, 47 Cal. App. 4th 364, 372-373 (1996)). Defendants further assert that "minor inaccuracies" do not amount to falsity, and therefore, that the First Amendment protects the statements at issue here. *Id.* at 9-10.

Finally, Defendants contend both Cal. Civ. Code section 47(d)(1) and Cal. Gov. Code Section 821.6 apply. *Id.* First, they argue that a statement is "fair and true" under section 47(d)(1) unless "the deviation is of such a substantial character that it produces a different effect on the

United States District Court
Northern District of California

1   [listener or] reader." *Id.* (quoting *Carver v. Bond*, 135 Cal. App. 4th 328, 351 (2005)).  That

2   standard is not met here, Defendants contend.  *Id.* Second, Defendants assert, Plaintiff has argued

3   that the statements at issue were not released as part of an investigation before the institution of a

4   judicial proceeding but he has offered no evidence in support of his position.  *Id.*  According to

5   Defendants, "[i]t is no coincidence that the most wanted statement was published *after* Quyen

6   Nguyen made a complaint against Plaintiff and a warrant for Plaintiff's arrest had been procured."

7   *Id.*[4]

8       **D.    Motion for Leave to Amend**

9           **Motion**

10   **1.** In his Motion for Leave to Amend, Plaintiff asks the Court for leave to substitute Hector

11   Jimenez and Anthony Rachal for Doe defendants 1 and 2, and to permit him to "amend the

12   Complaint to include any inadvertently omitted references, to correct any inartful verbiage, and

13   otherwise remedy any other pleading deficiencies."  Motion for Leave to Amend at 5.[5]  Plaintiff

14   asserts that under Rule 15(a) of the Federal Rules of Civil Procedure, the Court should permit

15   Plaintiff to amend the complaint because Defendants will not be unduly prejudiced, noting that

16   the Court has not yet set a deadline for filing amended pleadings or set a trial date.  *Id.* at 5.   In

17   addition, Plaintiff argues that leave to amend is in the interest of justice because "testimony of

18   JIMINEZ [sic] indicates he was not properly trained in investigations, and that he purposely

19   omitted information that needed to be disclosed to the magistrate in his affidavit to support the

20   warrant for Plaintiff's arrest."  *Id.*  He also accuses Defendants of "misrepresent[ing] key facts to

21   this Court contending no list for 'Most Wanted' persons ever existed, no documents associated

22   with the arrest of Plaintiff exist or had existed at some point in the past, and/or no documents

23   relating to the investigative file of the alleged assault with a deadly weapon exist either."  *Id.*   It

24   was not until "the recent depositions of Defendant WATSON, JIMENEZ, and supplemental

25   document productions" that Plaintiff learned of Defendants' "falsehoods," he asserts.  *Id.* at 7.

26

27   _____

[4] Defendants do not, however, offer any evidence about how it was decided that Chau Van would
28   be included on the list of "Most Wanted."
[5] As Plaintiff failed to include page numbers on his brief, the Court relies on the page numbers
assigned to Docket No. 56 by ECF, the Court's electronic filing system.

1   Nor has there been "undue delay, bad faith [or] dilatory motive" on Plaintiff's part in

2   seeking leave to amend, he argues. *Id*. at 6.   In particular, he points out that "this would be

3   Plaintiff's first amendment to the original Complaint not the fourth or fifth." *Id*.  Further, he

4   asserts, "[s]ince the initiation of this action there have been constant obstacles related to Plaintiff's

5   ability to conduct discovery." *Id*. at 4.  In particular, Plaintiff contends, Defendants have hindered

6   discovery in the following respects:

> At the initial case management conference, which was delayed by
> several months for reasons outside of Plaintiff's control, the
> court stayed all discovery until the parties went to mediation.  (Lacy Decl.
> at ¶¶2-5.) The Court set the non-expert discovery deadline for
> August 1, 2014 in its Order of April 28, 2014. (Lacy Decl. at ¶7.)
> Thereafter, Plaintiff propounded discovery but Defendants caused
> delays by requesting an extension and providing inadequate
> responses. (Lacy Decl. at ¶¶8-10.) The consequence of these delays
> was an extension of the discovery deadline, until November 14,
> 2014. (Lacy Decl. at ¶13.) Plaintiff initiated another round of
> discovery but again Defendants delayed in responding. (Lacy Decl.
> at ¶¶13-15.) These delays resulted in inability of Plaintiff to take
> noticed depositions. (Lacy Decl. at ¶¶15-16.)

14  *Id*. at 4.

15   Finally, Plaintiff argues that amendment is not futile because the claims against the new

16  defendants relate back, under Rule 15(c), to the filing date of the original complaint.  *Id*. at 7.

17  Plaintiff contends, "Defendants knew or should have known that the previous complaints

18  addressed an incident involving JIMINEZ [sic]  and RACHAEL [sic] because Defendants knew

19  who was involved in the construction of the 'Most Wanted' list of persons given to Defendants

20  WATSON, PERKINS, and JORDAN . . .[and] Defendants knew, or should have known, about

21  JIMENEZ'S role in the unlawful arrest of Plaintiff."  *Id*.  Further, he argues, Jimenez and Rachal

22  have received notice of the action.  *Id*.  Therefore, the requirements for relation back under Rule

23  15(c) are met as to both of the proposed new defendants.  *Id*. (citing Rule 15(c); *Marchant v. City*

24  *of Little Rock, Arkansas*, 741 F.2d 201, 205-206. (8th Cir. 1984)).

25                                   **Opposition**

26   Defendants argue that Plaintiff's request for leave to amend should be denied on the basis

27  of undue delay and also because the claims against Jimenez and Rachal do not relate back to the

28  original complaint and are thus untimely.  Opposition at 1.  With respect to the first argument,

1    Defendants reject Plaintiff's assertion that they hindered discovery or that Plaintiff could not have

2    discovered the involvement of Officer Jimenez  and Captain Rachal in the events at issue in this

3    case.  *Id*. at 2.  Regarding Officer Jimenez, Defendants state:

> Officer Jimenez was disclosed to plaintiff in defendants' Rule 26 initial disclosures more than 18 months prior to the filing of plaintiff's motion for leave to amend. Defendants' counsel produced video footage containing interviews of witnesses and the plaintiff – all conducted by Officer Jimenez – more than 12 months prior to the instant motion. Although plaintiff did not notice Officer Jimenez's deposition until July 2014 – more than one year after he was first disclosed to plaintiff – he has been well aware of Officer Jimenez's relevance to the lawsuit and appears to have made a conscious decision not to previously name Officer Jimenez in the complaint.

*Id*.; *see also* Declaration of James F. Hodgkins in Support of Defendants' Opposition to Plaintiff's

Motion for Leave to File First Amended Complaint ("Hodgkins Opposition Decl.") ¶ 5 (stating

that on September 16, 2013, counsel for Defendants gave Mr. Lacy a video of the interviews

conducted by Officer Jimenez of the Nguyens, a copy of the arrest warrant that named Officer

Jimenez as the officer who signed the supporting affidavit,[6] and a copy of the photo line-up waiver

statement naming Officer Jimenez as the officer who conducted the photo line-up).

    Captain Rachal's involvement also could have been discovered much earlier in the case,

Defendants assert:

> [P]laintiff seeks to belatedly name Rachal as a defendant in the case, implying from exhibits to the instant motion that he only discovered Rachal's name after deposing Officer Johnna Watson on November 19, 2014. While it may be true that the deposition occurred shortly before plaintiff's motion for leave to amend, plaintiff has had the ability to "discover" Rachal's name and depose him for more than a year. Plaintiff conveniently fails to mention that Officer Watson's name was disclosed in defendants' Rule 26 disclosures in June 2013. Instead of diligently litigating this case in the manner anticipated by the Court and the federal rules, *plaintiff failed to serve a single deposition notice/subpoena – including one for Officer Jimenez – until July 2014, nearly one year after the Court opened discovery*. Even though plaintiff had much of the information necessary to depose or seek discovery pertaining to Officer Jimenez and Rachal more than one year ago, he instead, misrepresents to the Court that defendants have thwarted his efforts.

---

[6] At oral argument, Defendants conceded that they did not produce the affidavit itself at that time. Plaintiff's counsel represented at oral argument that he did not receive the affidavit that Officer Jimenez submitted to the magistrate until June 2014.

18

United States District Court
Northern District of California

*Id.* (emphasis added).  Under these circumstances, Defendants contend, Plaintiff has failed to demonstrate that it is in the interest of justice to permit Plaintiff to amend the complaint to add two new defendants.  *Id.*

Defendants also reject Plaintiff's assertion that the claims against Jimenez and Rachal relate back to the original complaint and therefore are not time-barred.  *Id.* at 4-7.  As a preliminary matter, the claims Plaintiff seeks to assert against these defendants are governed by either a one or two-year statute of limitations, Defendants contend.  *Id.* at 4-5 (citing Cal. Civ. Code §§ 335.1, 340; *Usher v. City of Los Angeles*, 828 F.2d 556, 558 (9th Cir. 1987)).  Because the claims accrued in February 2012, Defendants argue, they are untimely unless they relate back to the original complaint.  *Id.* at 5 (citing Fed. R. Civ. P. 15(c)(1)(C)).  Further, under Rule 15(c)(1)(C),[7] the claims do not relate back, Defendants argue.  *Id.*  First, they assert, neither Jimenez nor Rachal received any notice of this action within 120 days, as required under Rule 4(m), which is incorporated into Rule 15(c)(1)(C).  *Id.*  In particular, Defendants' counsel states that he does not recall having any conversations with Officer Jimenez  about this lawsuit prior to July 5, 2013 (when the 120 days expired) and that as far as he knows, Captain Rachal (now retired) has no awareness of this lawsuit even now.  *Id.* at 6 (citing  Hodgkins Decl., ¶¶ 11-13, 22-25).  Second, there is no evidence that either Jimenez or Rachal would or should have known that Plaintiff's complaint would have been brought against them "but for a mistake in identity," Defendants argue.  *Id.* at 6.

---

[7] Rule 15(c)(1)(C) provides that an amendment will relate back if the following requirements are met:

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).

United States District Court
Northern District of California

1         **Reply**

2       Plaintiff did not file a Reply in response to Defendants' opposition brief.

3  **III.**    **MOTION FOR LEAVE TO AMEND**

4    **3.A.**   **Legal Standard under Rule 15(a)**

5       Pursuant to Rule 15(a), a party may amend a pleading once as a matter of course;

6 subsequently, it may only amend after obtaining leave of the court, or by consent of the adverse

7 party. *See* Fed.R.Civ.P. 15(a). Rule 15 advises the court that "leave shall be freely given when

8 justice so requires." Fed.R.Civ.P. 15(a)(2). "[T]his policy is to be applied with extreme

9 liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir.2001). "Courts

10 may decline to grant leave to amend only if there is strong evidence of 'undue delay, bad faith or

11 dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

12 previously allowed, undue prejudice to the opposing party by virtue of allowance of the

13 amendment, [or] futility of amendment, etc.'" *Sonoma County Ass'n of Retired Employees v.*

14 *Sonoma County*, 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178,

15 182 (1962)). These factors are referred to as the "*Fomen* factors." *Id.*

16       The *Fomen* factors "are not of equal weight in that delay, by itself, is insufficient to justify

17 denial of leave to amend." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)

18 (citations omitted). Prejudice, on the other hand, is the weightiest and most important of the

19 *Fomen* factors. *Sonoma County Ass'n of Retired Employees v. Sonoma County*, 708 F.3d at 1117

20 (citing *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)). Further,

21 "[f]utility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v.*

22 *Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

23      **B.**    **Discussion**

24         **Undue Delay**

25      The parties present widely divergent accounts of the discovery efforts that have occurred in

26 this case, with Plaintiff's counsel accusing Defendants' counsel of hindering his discovery efforts

27 and Defendants' counsel asserting that delays in the production of documents and as to

28 depositions were the result of Plaintiff's counsel's lack of diligence. The Court has reviewed the

United States District Court
Northern District of California

1  declarations of counsel offered in support of the Motion for Leave to Amend as well as the record

2  in this case and finds that Plaintiff's counsel has shown a lack of diligence in pursuing discovery.

3     Plaintiff's counsel repeatedly delayed taking depositions in this case, including the

4  depositions of the Defendants named in the original complaint (who could have – and eventually

5  did – provide information showing that Captain Rachal was the head of the department

6  responsible for the "Most Wanted" list upon which Plaintiff bases many of his claims) and the

7  deposition of Officer Jimenez.  Plaintiff's counsel was aware of Officer Jimenez's involvement in

8  the underlying events of this case by September 2013, when the City of Oakland provided a video

9  CD of the interviews with the Nguyen siblings, as well as a copy of the arrest warrant showing

10  that Officer Jimenez had signed the supporting affidavit.  *See*  Hodgkins Opposition Declaration ¶

11  5.  The fact that he did not receive the actual affidavit until June 2014 is of no moment because he

12  did not act diligently to obtain that document once he became aware of it. Further, it appears that

13  Plaintiff's counsel was aware of the need to depose Officer Jimenez by September 2013.  In

14  particular, according to Mr. Hodgkins, Mr. Lacy represented  to the Court at the September 20,

15  2013 Case Management Conference that he wanted to depose Officer Jimenez  prior to engaging

16  in further mediation efforts.  *Id*. ¶ 6.[8]

17     Plaintiff's counsel also had the opportunity to take these depositions as of September 20,

18  2013, when the Court expressly permitted each side to conduct up to "three (3) depositions each

19  before the next mediation."  Docket No. 25.  The Court did not impose any limitation as to *who*

20  the parties could depose.   Plaintiff's counsel did not, however, conduct *any* depositions prior to

21  the date in December 2013 when the parties were scheduled for their second mediation.  Hodgkins

22  Opposition Decl. ¶ 7.  Consequently, the mediator rescheduled the mediation to give Plaintiff's

23  counsel additional time to conduct discovery.  *See* Hodgkins Opposition Decl. ¶¶ 7-8.  Still, he did

24           

25  [8] At oral argument, Mr. Lacy suggested that he did *not* specifically state that he needed to depose
Officer Jimenez at that time, contrary to Mr. Hodgkins' representation in his declaration.  Had

26  Plaintiff filed a reply brief, counsel could have included a sworn declaration stating as much.
Even assuming Mr. Lacy did not state at the Case Management Conference that he wished to

27  depose Officer Jimenez, however, the Court would reach the same conclusion, that is, that counsel
unduly delayed taking key depositions, because, as discussed above, Mr. Lacy was on notice by

28  September 2013 that Officer Jimenez played a key role in Plaintiff's arrest and supplied the
affidavit upon which the arrest warrant was based.

1    not notice any depositions and no deposition had been taken by Plaintiff's counsel when the

2    second mediation finally occurred, on April 2, 2014.[9]

3         It was not until July 17, 2014, just before the scheduled fact discovery cut-off of August 1,

4    2014, that Plaintiff's counsel finally noticed depositions in the case, but because he failed to meet

5    and confer with opposing counsel, as required under Civ. L.R. 30-1, the depositions were noticed

6    for dates on which Defendants' counsel was unavailable.  *Id.*, ¶ 13.  Defendants subsequently

7    agreed to extend discovery to permit the depositions to occur and Plaintiff's counsel finally

8    conducted a number of depositions in November 2014, including that of Officer Jimenez (on

9    November 13, 2014) and Officer Watson (on November 19, 2014).[10]  Even then, however, he did

10   not inform the Court or opposing counsel that he intended to seek leave to amend his complaint,

11   even though the parties appeared at a Case Management Conference on November 14, 2014 – a

12   day *after* Plaintiff's counsel had deposed Officer Jimenez.  *See* Docket No. 45;  Hodgkins

13   Opposition Decl. ¶ 25.  It was not until almost two months had passed that he finally filed a

14   motion seeking leave to amend his complaint.  At that point, Defendants' summary judgment

15   motion had already been fully briefed.  Counsel's delay is inexcusable and, when considered in

16   combination with the resulting prejudice (discussed below) supports the conclusion that leave to

17   amend should be denied.

18                     **Undue Prejudice**

19         As noted above, the question of prejudice is an important factor in deciding whether leave

20   to amend should be granted. "'Undue prejudice' means substantial prejudice or substantial

21   _____

22   [9] At oral argument, Mr. Lacy stated that he did not take any depositions because he had intended
     to use his three depositions to depose three individuals who were at the scene of the underlying

23   events but was unable to find them;  counsel was unable to explain why he did not, under these
     circumstances, use the three permitted depositions to depose Officer Jimenez or at least some of

24   the named Defendants.
     [10] Plaintiff did not succeed in arranging a deposition for Chief Howard Jordan.  According to

25   Defendant's counsel, he proposed multiple dates for the deposition, all of which were rejected by
     Plaintiff's counsel.  Declaration of James F. Hodgkins in Support of Reply to Opposition to

26   Motion for Summary Judgment ("Hodgkins Reply Decl."), ¶ 15.  One of the proposed dates was
     December 17, 2014, which Plaintiff's counsel had said would work for him.  *Id.*  However,

27   Plaintiff's counsel rejected the proposal that the deposition begin that day starting at 1 pm and
     continue the next day, if necessary, telling Defendants' counsel that he could not start the

28   deposition at such a late hour.  *Id.*  Therefore, to the extent Plaintiff now asserts that he was
     deprived of the opportunity to depose Chief Jordan, he has only himself to blame.

negative effect; the Ninth Circuit has found such substantial prejudice where the claims sought to be added 'would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense.'" *SAES Getters S.p.A. v. Aeronex, Inc*., 219 F.Supp.2d 1081, 1086 (S.D. Cal., 2002) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)). "A need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend the complaint." *Lockheed Martin Corp. v. Network Solutions, Inc*. 194 F.3d 980, 986 (9th Cir. 1999) (citing *Solomon v. North Am. Life & Cas. Ins. Co*., 151 F.3d 1132, 1139 (9th Cir.1998)). On the other hand, prejudice is mitigated where the case is still in the discovery stage, no trial date is pending and no pretrial conference has occurred. *See DCD Programs Ltd. v. Leighton*, 833 F.2d at 187-188.

The Court concludes that under the circumstances here the prejudice to Defendants is undue. Discovery in this case closed several months ago and would have closed in August of last year had Plaintiff been diligent in pursuing discovery. Although a trial date has not yet been set, Defendants have already filed their summary judgment motion which will, if granted, dispose of virtually the entire case. If the Court were to permit Plaintiff to amend his complaint, however, Defendants likely would be required to withdraw their summary judgment motion and file an entirely new summary judgment motion addressing all of Plaintiff's claims. It should be noted that the claims Plaintiff seeks to add are intertwined with those that were asserted in the original complaint; thus, the arguments that have been made in the pending motion would likely need to be revised to take into account any new evidence and arguments that will be made as to Officer Jimenez and Captain Rachal.[11] In addition, Plaintiff's addition of two new parties will inevitably lead to a new round of discovery, now months after discovery has closed. Certainly the new parties would be entitled to such discovery – and the existing parties would be entitled to take new

---

[11] Similarly, although Plaintiff named Chief Jordan as a defendant in the original complaint, he did not identify Chief Jordan as a defendant on his Third Cause of Action, for defamation. Therefore, Defendants would be required to revise their request for summary judgment to address that claim if the Court were to permit Plaintiff to file his First Amended Complaint, which names as Defendants Chief Jordan, Captain Rachal, Defendants Watson and Perkins, and Does 1-10. *See* Docket No. 57-5.

United States District Court
Northern District of California

1   discovery regarding the claims against the new parties.

2          Under these circumstances, the Court concludes that the prejudice that would result from

3   permitting amendment is undue, even though a trial date has not yet been set.  Given the heavy

4   weight placed on this factor, and in light of the undue delay discussed above, the Court finds that

5   these two *Fomen* factors, on their own, are sufficient to warrant denial of the Motion for Leave to

6   Amend.

7                              **Futility**

8          The Court further finds, as a separate and independent basis for denial of the Motion for

9   Leave to Amend, that amendment is futile.  Plaintiff has not challenged Defendants' assertion that

10  the claims he seeks to add to the complaint will be timely only if they relate back to the original

11  filing date under Rule 15(c) of the Federal Rules of Civil Procedure.  Rule 15(c)(1)(C) provides

12  that an amendment will relate back if the following requirements are met:

13              (C) the amendment changes the party or the naming of the party
                against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and
14              if, within the period provided by Rule 4(m) for serving the summons
                and complaint, the party to be brought in by amendment:
15
                    (i) received such notice of the action that it will not be
16              prejudiced in defending on the merits; and

17                  (ii) knew or should have known that the action would have been
                brought against it, but for a mistake concerning the proper party's
18              identity.

19  Fed. R. Civ. P. 15(c)(1)(C).  The "period provided by Rule 4(m)" is 120 days unless that deadline

20  is extended by the Court on a showing of good cause.  Here, there is nothing in the original

21  complaint that would have indicated to Officer Jimenez and Captain Rachal that Plaintiff intended

22  to bring the action against those defendants but for a "mistake concerning the proper party's

23  identity."  In addition, the only evidence in the record shows that neither individual received any

24  notice of the action within the period allowed under Rule 4(m).  *See* Hodgkins Opposition Decl. ¶¶

25  23-24. Accordingly, amendment of the complaint would be futile because the claims Plaintiff

26  seeks to assert against Officer Jimenez and Captain Rachal are untimely.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### Conclusion

Having applied the *Fomen* factors and for the reasons discussed above, the Court DENIES Plaintiff's Motion for Leave to Amend.  The Court further DISMISSES Plaintiff's Third Cause of Action, for defamation.  In the operative complaint, this claim is asserted only against Doe defendants.  The Ninth Circuit has noted although Doe defendants are disfavored, there are circumstances under which "the identity of alleged defendants will not be known prior to the filing of a complaint" and therefore, "the plaintiff should be given an opportunity through discovery to identify the unknown defendants."  *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).  Those circumstances do not exist here, however, where the defendants Plaintiff now seeks to name on this Third Cause of Action (Jordan, Watson and Perkins) were known at the outset of the action and, as discussed above, the *Fomen* factors support denial of Plaintiff's request to amend his complaint to add new parties.  Because only Doe defendants are named on Plaintiff's Third Cause of Action, that claim is dismissed with prejudice for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## IV.     MOTION FOR SUMMARY JUDGMENT

### A.     Legal Standard on Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial."  *Id*.  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion"

25

United States District Court
Northern District of California

and may also "allow time to obtain affidavits or declarations or to take discovery."  Fed.R.Civ.P

56(d);  see also *Tatum v. City and County of San Francisco*, 41 F.3d 1090, 1100 (9th Cir. 2006)

("A party requesting a continuance pursuant to [Rule 56(d)] must identify by affidavit the specific

facts that further discovery would reveal, and explain why those facts would preclude summary

judgment").  The court may deny a request pursuant to Rule 56(d) where a party has failed

diligently to pursue discovery prior to summary judgment.  *Mackey v. Pioneer Nat. Bank*, 867

F.2d 520, 524 (9th Cir. 1989) ("A movant cannot complain if it fails diligently to pursue discovery

before summary judgment").

### B.   Request for Additional Discovery Pursuant to Rule 56(d)

As discussed above, Plaintiff's counsel failed to pursue discovery diligently, waiting until

the last days of the fact discovery period to conduct key depositions, even with an impending

deadline for dispositive motions.   With respect to Chief Jordan, who has not yet been deposed, it

appears that Plaintiff's counsel bears a significant part of the responsibility for the fact that the

parties have been unable to schedule that deposition.   Further, Plaintiff has not offered an affidavit

identifying with specificity the facts he seeks to discover through additional discovery under Rule

56(d).  Nor has he identified any specific facts in his brief.  Accordingly, Plaintiff's request that the

Court defer ruling on Defendants' Summary Judgment Motion to permit additional discovery is

DENIED.

### C.   First Cause of Action (42 U.S.C. § 1983, Against Defendants Perkins and Watson)

Section 1983 provides "a method for vindicating federal rights elsewhere conferred."

*Graham v. Connor*,  490 U.S. 386, 393-94 (1989) (citation omitted)).  "Section 1983 does not

create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by

governmental officials."  *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).   A plaintiff

bringing a claim under § 1983 must show that "(1) the action occurred 'under color of state law'

and (2) the action resulted in the deprivation of a constitutional right or federal statutory right."

*Id*. (citation omitted).  "In order for a person acting under color of state law to be liable under

section 1983 there must be a showing of personal participation in the alleged rights deprivation:

1   there is no respondeat superior liability under section 1983."  *Id.* (citing *Monell v. Dep't of Soc.*

2   *Servs.*, 436 U.S. 658 (1978)).

3       Plaintiff asserts his First Cause of Action on the basis of alleged violations of the First and

4   Fourth Amendments to the United States Constitution.  For the reasons stated below, the Court

5   finds that Plaintiff's claim fails on summary judgment.

6                           **Fourth Amendment**

7       "An officer's liability under section 1983 is predicated on his 'integral participation' in the

8   alleged violation."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n. 12 (9th Cir. 2007) (citing

9   *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996)).  In *Blankenhorn,* the court explained

10  that "[i]ntegral participation does not require that each officer's actions themselves rise to the level

11  of a constitutional violation . . . [b]ut it does require some fundamental involvement in the conduct

12  that allegedly caused the violation."  *Id.* (citations and quotations omitted).  Thus, "[o]fficers are

13  fundamentally involved in the alleged violation when they provide some affirmative physical

14  support at the scene of the alleged violation and when they are aware of the plan to commit the

15  alleged violation or have reason to know of such a plan, but do not object."  *Monteilh v. County of*

16  *Los Angeles*, 820 F.Supp.2d 1081, 1089-1090 (C.D.Cal., 2011).  "Additionally, officers may be

17  integral participants even if they have no knowledge of a plan to commit the alleged violation if

18  their physical participation in the alleged violation was part of a closely related series of physical

19  acts leading to the violation. "  *Id.* (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n. 12

20  (9th Cir.2007)).

21      Plaintiff contends his Fourth Amendment rights were violated when he was arrested

22  without probable cause and that Defendants Watson and Perkins were integral participants in the

23  constitutional violation because they were involved in drafting the press release that identified

24  Plaintiff as one of Oakland's "Most Wanted."   Plaintiff's theory seems to be that because he

25  ultimately turned himself in and then was arrested (allegedly without probable cause) these

26  Defendants played a fundamental role in his arrest.  However, he has pointed to no authority

27  suggesting that a defendant can be found to have played a fundamental role in an alleged

28  constitutional violation under circumstances such as these.  Nor does the Court find any such

United States District Court
Northern District of California

United States District Court
Northern District of California

authority.   Even assuming that the acts of Watson and Perkins played a part in setting in motion a chain of events that ultimately led to a Fourth Amendment violation, the connection between the conduct of Defendants Watson and Perkins and the alleged constitutional violation is simply too attenuated for any reasonable jury to conclude that they played a fundamental role in the violation. Therefore, the Court concludes that Plaintiff's § 1983 claim based on alleged violation of the Fourth Amendment by Defendants Watson and Perkins fails to survive summary judgment. Having reached this conclusion, the Court declines to reach Defendants' arguments that this claim fails because there was no Fourth Amendment violation.

**First Amendment Violation**

2. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore,* 547 U.S. 250, 256 (2006).  Plaintiff has not, however, offered any evidence (or even alleged) that he engaged in any constitutionally protected speech.  Further, although Plaintiff contends he should be permitted to conduct further discovery on the claim, he fails to specify what evidence he expects to obtain in support of this claim.  Nor has he explained how it might allow him to prevail on a claim of First Amendment retaliation where he has not alleged that he engaged in any constitutionally protected speech.  Therefore, Defendants are entitled to summary judgment on this claim.

**D.    Second Cause of Action (42 U.S.C. § 1983 , Against City of Oakland, Chief Jordan)[12]**

Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its employees on a theory of respondeat superior.  *Monell*, 436 U.S. at 691.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id*. at 694.  One way to satisfy this requirement is to demonstrate that a municipal employee committed the alleged constitutional violation "pursuant to

---

[12]  Plaintiff's complaint indicates that he is suing Chief Jordan in his individual capacity.  As there is no evidence of any individual involvement on Chief Jordan's part, this claim fails as a matter of law.

1  a formal governmental policy or longstanding practice or custom which constitutes the standard

2  operating procedure of the local governmental entity." *Gillette v. Delmore*, 979 F.2d 1342, 1346

3  (9th Cir. 1992).   Thus, a municipality may be liable for a constitutional violation under § 1983

4  where the alleged constitutional violation was the result of a policy of providing inadequate

5  training of employees and "where the failure to train amounts to deliberate indifference to the

6  rights of persons with whom the police come into contact." *See City of Canton v. Harris*, 489 U.S.

7  378, 388 (1989).  In *City of Canton*, however, the Supreme Court made clear that "the focus must

8  be on adequacy of the training program in relation to the tasks the particular officers must

9  perform." *Id*. at 390-91.  It went on to explain, "[t]hat a particular officer may be unsatisfactorily

10  trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have

11  resulted from factors other than a faulty training program." *Id*.

12        Here, the only evidence offered by Plaintiff in support of his *Monell* claim relates to the

13  training received by Officer Jimenez.  Even assuming this evidence is sufficient to show that

14  Officer Jimenez received inadequate training, it is inadequate, as a matter of law, to demonstrate a

15  policy of inadequate training sufficient to establish liability on the part of the City of Oakland or

16  Chief Jordan (to the extent Plaintiffs intended to sue Chief Jordan in his official capacity) under

17  *Monell*.  Therefore, Defendants are entitled to summary judgment on Plaintiff's Second Cause of

18  Action.

19        **E.     Claim Four (False Arrest and Imprisonment, Against Defendants Watson and**
20             **Perkins)**

21        Where a claim of false imprisonment is based on an alleged false arrest, the torts of false

22  arrest and false imprisonment are the same because "false arrest is but one way of committing a

23  false imprisonment." *Collins v. City and County of San Francisco*, 50 Cal.App.3d 671, 673

24  (1975). "If Plaintiff's arrest or confinement was without probable cause – a situation that might

25  arise if probable cause was lacking for the warrant – California law does not provide immunity

26  from liability for false arrest for the arresting officer." *Riley v. Modesto Irr. Dist*.,  Case No. C-10-

27  2281 AWI,  2011 WL 3101796, at *6 (E.D. Cal., July 25, 2011) (citing *Gillan v. City of San*

28  *Marino*, 147 Cal.App.4th 1050 -1051 (2007)).  In order to be liable for false arrest, however, the

United States District Court
Northern District of California

defendant "must have taken some active part in bringing about the unlawful arrest." *Hughes v. Oreb*, 36 Cal.2d 854, 859 (1951).  This rule does not limit liability to the arresting officer;  where the arrest was made "by an officer at 'the instance and instigation' or 'direction' of defendant, the defendant may also be liable for false arrest.  *Collins v. Owens*, 77 Cal.App.2d 713, 719 (1947).  Here, however, there is no evidence that the named Defendants, Watson and Perkins, directed or instigated the arrest.  As discussed above, at most, they played a part in initiating a chain of events that eventually led to Plaintiff's self-surrender and arrest by Officer Jimenez.  Plaintiff has offered no authority that such conduct is sufficient to support a false arrest claim, and the Court has found none.[13]  Therefore, this claim fails as a matter of law.

### F.    Claim Five and Six (Intentional Infliction of Emotional Distress and Negligence, Against Defendants Watson and Perkins Based on Communications Identifying Plaintiff as Oakland's "Most Wanted")[14]

Defendants challenge on three grounds Plaintiff's claims against Defendants Watson and Perkins based on the communications identifying him as Oakland's "Most Wanted": 1) the Free Speech Clause of the First Amendment; 2)   Cal. Civ. Code section 47(d)(1); and 3) Cal. Gov't Code section 821.6.

#### 1.

#### First Amendment

"The Free Speech Clause of the First Amendment – 'Congress shall make no law . . . abridging the freedom of speech' – can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress."  *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011)

---

[13] The Court further notes that even if the involvement of Watson and Perkins were sufficient to show that they could be held liable for false arrest, the claim would fail under Cal. Civ. Code section 43.55(a), which provides that "no cause of action shall arise against any peace officer who makes an arrest pursuant to a warrant of arrest regular on its face if the peace officer in making the arrest acts without malice and in reasonable belief that the person arrested is the one referred to in the warrant."  Even assuming that there is a fact question as to whether Officer Jimenez would be entitled to immunity under this provision, there is no evidence that Watson or Perkins had any reason to believe that the search warrant obtained by Officer Jimenez was not valid or that Plaintiff was not the individual referred to in the search warrant.  Therefore, Watson and Perkins are entitled to immunity under this provision as a matter of law on Plaintiff's false arrest claim.

[14] Plaintiff does not identify in the complaint the particular conduct upon which these claims are based.  To the extent they may be based on Plaintiff's arrest rather than the press release identifying him as one of Oakland's "Most Wanted", these claims also fail for the reasons discussed above as to the false arrest claim, namely, that neither of the named defendants had any involvement in Plaintiff's arrest.

United States District Court
Northern District of California

1   (citation omitted).  Thus, in *Philadelphia Newspapers, Inc. v. Hepps*, the Court held that "where a

2   newspaper publishes speech of public concern, a private-figure plaintiff cannot recover damages

3   without also showing that the statements at issue are false."  475 U.S. 767, 768-769 (1986).  This

4   holding shifts the burden of proving falsity to the plaintiff, deviating from the common law rule

5   that the truth of an allegedly defamatory statement is a defense that must be proved by the

6   defendant.  *See id*. at 776.  California courts have found that the holding of *Hepps* applies in cases

7   involving non-media defendants as well as media defendants.  *See Nizam-Aldine v. City of*

8   *Oakland*, 47 Cal. App. 4th 364, 373-375 (1996).  Consequently, Defendants are entitled to

9   summary judgment on Plaintiff's Fifth and Sixth Causes of Action if: 1) the communications, as a

10   matter of law, relate to matters of public concern; and 2) no jury could reasonably conclude based

11   on the evidence in the record, that the communications are false.

12         "Speech deals with matters of public concern when it can be fairly considered as relating to

13   any matter of political, social, or other concern to the community,. . . or when it is a subject of

14   legitimate news interest; that is, a subject of general interest and of value and concern to the

15   public."  *Snyder v. Phelps*, 131 S. Ct.  at 1216 (internal quotations and citations omitted).   It is

16   undisputed that the statements here were made in the context of a press conference and in a related

17   press release by the Oakland Police Department addressing a recent spike in crime and asking for

18   the assistance of the community.  This is clearly a matter of public concern and Plaintiff has

19   pointed to no authority that supports a contrary conclusion.  Further, Plaintiff's conclusory

20   statement in his brief that the statements are not a matter of public concern because they were "not

21   for public debate" *see* Opposition at 23, misses the mark because that is not the test.

22         The only remaining question is whether Plaintiff has pointed to sufficient evidence to

23   create a fact question as to whether the statements at issue were false.  In *Masson v. New Yorker*

24   *Magazine, Inc.*, the Supreme Court set forth the following standard for proving falsity:

25           The common law of libel takes but one approach to the question of
             falsity, regardless of the form of the communication.  See
26           Restatement (Second) of Torts § 563, Comment c (1977); W.
             Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on
27           Law of Torts 776 (5th ed. 1984). It overlooks minor inaccuracies
             and concentrates upon substantial truth. As in other jurisdictions,
28           California law permits the defense of substantial truth and would

1
2
3

> absolve a defendant even if she cannot "justify every word of the
> alleged defamatory matter; it is sufficient if the substance of the
> charge be proved true, irrespective of slight inaccuracy in the
> details." 5 B. Witkin, Summary of California Law § 495 (9th ed.
> 1988) (citing cases).

4   501 U.S. 496, 516-517 (1991).  The Court continued, "[p]ut another way, the statement is not

5   considered false unless it 'would have a different effect on the mind of the reader from that which

6   the pleaded truth would have produced.'"  *Id*. (quoting R. Sack, Libel, Slander, and Related

7   Problems 138 (1980)).  "Whether a statement contains provably false factual assertions is a

8   question of law for the trial court to decide."  *Eisenberg v. Alameda Newspapers, Inc*., 74 Cal.

9   App. 4th 1359, 1382 (1999).

10        The statements here can be broken into two components:  1) whether Van was, in fact, one

11   of Oakland's "Most Wanted"; and 2) whether he was "Wanted for Shooting," as stated in the press

12   release.  As to the first component, Plaintiff has offered no evidence from which a jury could

13   reasonably conclude Plaintiff Chau Van was *not* one of Oakland's "Most Wanted."  In fact, as

14   Plaintiff concedes in his request to conduct further discovery, he has uncovered no evidence

15   whatsoever as to how or why Plaintiff was listed as one of Oakland's "Most Wanted."  The

16   statement that Van was wanted for a "shooting" presents a closer call.  Defendants concede that

17   the statement that Van was wanted for a shooting was incorrect.  *See* Motion at 15 (conceding that

18   "the press communications incorrectly stated Plaintiff was wanted for a shooting instead of for

19   assault with a deadly weapon" but that this error, "while unfortunate, is irrelevant").  Nonetheless,

20   the undisputed evidence – namely, the warrant obtained by Officer Jimenez for Van's arrest – *does*

21   establish that Van was being sought for assault with a deadly weapon.   Under the standard set

22   forth above, the Court concludes that this evidence supports the conclusion that the statement was

23   "substantially true."[15]

24        Therefore, the Court holds that Plaintiff's tort claims based on the communications that he

25

26   _____

27   [15] The Court notes that it does *not* reach the question of whether there was probable cause to
believe Plaintiff assaulted Quyen Nguyen with a deadly weapon of any kind, whether a baseball
bat, a pipe or a gun.  It simply relies on the fact that Officer Jimenez had obtained a search warrant
28   for such an assault, indicating that Plaintiff was wanted for assault with a deadly weapon by the
Police Department of the City of Oakland.

United States District Court
Northern District of California

1    was Oakland's "Most Wanted" and that he was wanted for a shooting fail on summary judgment.

2                          **Cal. Civ. Code section 47(d)(1)**

3            Section 47(d)(1) provides, in relevant part, that "[a] privileged publication or broadcast is

4    one made . . . By a fair and true report in, or a communication to, a public journal, of (A) a

5    judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the

6    course thereof . . . ."  California courts have held that statements made in the course of a police

7    investigation fall under this privilege if they are "fair and true."  *Balzaga v. Fox News Network,*

8    *LLC,* 173 Cal.App. 4th 1325, 1337 (2009).  The "fair and true" requirement is governed by

9    essentially the same standard as the one discussed above for falsity under the First Amendment:

10   "The privilege applies if the substance of the publication or broadcast captures the gist or sting of

11   the statements made in the official proceedings." *Id.* (citing *Carver v. Bonds,* 135 Cal. App. 4th

12   328, 351) (2005)).  Plaintiff does not dispute that the communications were made in the course of

13   a "public official proceeding."  Rather, he argues that they are not "fair and true."  The Court

14   rejects Plaintiff's position for the same reasons it found that Plaintiff failed to meet his burden as

15   to the First Amendment defense asserted by Defendants.  Therefore, Defendants are entitled to

16   summary judgment on the Fifth and Sixth Causes of Action on the additional ground that the

17   statements are privileged under Cal. Civ. Code section 47(d)(1).

18                          **Cal. Gov't Code section 821.6**

19           Cal. Gov't Code provides that "[a] public employee is not liable for injury caused by his

20   instituting or prosecuting any judicial or administrative proceeding within the scope of his

21   employment, even if he acts maliciously and without probable cause."  "Courts have held that the

22   institution and prosecution of judicial proceeding in Government Code section 821.6 is not limited

23   to the act of filing a criminal complaint." *County of Los Angeles v. Superior Court,* 181 Cal. App.

24   4th 218, 229 (2009).  Thus, "[a]cts taken during an investigation prior to the institution of a

25   judicial proceeding are also protected by section 821.6 because investigations are an essential step

26   toward the institution of formal proceedings."  *Id.* (citations omitted).  Further, "the immunity

27   applies even if the authorities later decide not to file charges."  *Id.*  (citations omitted).

28           Although Plaintiff makes the conclusory assertion that the communications at issue were

United States District Court
Northern District of California

33

not part of an investigation before the institution of a judicial proceeding, California courts have reached a contrary conclusion under similar circumstances. *See, e.g., Gillan v. City of San Marino*, 147 Cal.App.4th 1033, 1050 (2007) (holding that police department employees responsible for issuing press release stating that plaintiff was being investigated for sexual molestation were immune from liability on defamation and intentional infliction of emotional distress claims under section 821.6). The Court therefore finds, based on the undisputed facts, that Defendants Watson and Perkins are entitled to immunity under Cal. Gov't Code section 821.6.

## V.   CONCLUSION

For the reasons stated above, Plaintiff's Motion for Leave to Amend is DENIED. Plaintiff's Third Cause of Action is DISMISSED with prejudice for failure to state a claim. Defendants' Motion for Summary Judgment is GRANTED. Accordingly, all of Plaintiff's claims are dismissed, in their entirety. The Clerk is instructed to enter judgment in favor of Defendants and close the file.

**IT IS SO ORDERED.**

Dated: March 3, 2015

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

34